County Commissioners, 22-3-0-8-1. Good morning, Your Honors, and may it please the Court. My name is Kenneth Kenney, and I represent Ron Rutledge, who is asking this Court to reverse summary judgment on his claims of wrongful discharge under the Americans with Disabilities Act, the Family Medical Leave Act, and under Kansas law. In the next 12 minutes and 43 seconds, because I would like to save three minutes for rebuttal, or a little less than that, I would like this Court to see how, when the totality of circumstances are viewed in my client's favor, they could allow a jury to find that the county used this break room incident as an excuse to fire my client, even though it was motivated by other factors. I want to help this Court understand how our different pretext arguments come together, and in the aggregate, when they're viewed in the aggregate, as the law requires, they create a plausible narrative that would allow a jury to find that my client's disabilities, requests for accommodation, extensive medical leave, and workers' compensation activities were among the factors that motivated his termination. And finally, I want to help this Court realize how the district court's use of the honest belief doctrine produced a result that was influenced by assessing credibility and weighing the evidence, which violates the mandatory law of summary judgment. And I realize in the brief there's arguments about each stage of the McDonnell-Douglas burden shifting, and I want to focus on the ultimate issue that will persuade a jury, and that is pretext. And I want to highlight what I think are five material facts that would cause a jury to realize that there's two plausible narratives here, and what could allow a jury to permissibly exercise their civic duty to return a verdict for my client. First is that the county had a preexisting motive to get rid of my client before the break room incident. That is set forth in the record, and four years before my client was fired, there's an email from Timothy Henschel, who's the HR deputy director that's helping to fire my client, and it's expressly stated in that email that the county's goal was to settle the workers' compensation claim to include a separation from employment. That is evidence of a preexisting motive that's directly connected to my client's protected classes. Also going with that preexisting motive is the fact that the county is self-insured for workers' compensation. That is an incredible financial motive to get rid of my client in this case that the district court didn't even include in its order. My client was injured in 2006, and currently, as I stand in this courtroom today, he has five workers' compensation injuries that have never been resolved. Every minute of injury leave was paid for out of the county's own money, and that is a financial motive to get rid of him. The next material fact that I think would persuade a jury is the fact that it's shortly after Jeremy McCracken becomes my client's new supervisor that we see my client being fired. Jeremy McCracken, the bully who called, it is undisputed in the record, that he called my client half-timer, and the district court said that not necessarily related to his extensive medical leave. A jury would think so. Why is he calling my client half-timer? Because he misses a lot of work for his disabilities. He also is the supervisor that when my client approached him six weeks before he got fired and there was a dispute about this ladder that was an accommodation, Jeremy McCracken responded by telling him, tough shit. That was a response to a request for an accommodation. I know the briefing, there's many disputes about whether that ladder was, in fact, an accommodation. They provided it. I don't know if I want to get into these facts, but they provided a ladder. They did provide a ladder for him. They did provide a ladder. They complained about that ladder. Right. The new ladder. The argument is that, I understand the plaintiff's argument is that that's when the tough shit comment comes up. Well, the new ladder that was purchased, part of what my client complained about was that the new ladder exceeded his weight limit. The weight limit was so focused on the lifting restriction, the permanent restriction in the record, which can be found at page, it's in the appendix, volume three on page 45. The permanent restrictions also included a pushing and pulling restriction. So, the cussing phrase was in response to my client complaining that this new ladder also doesn't work. And that is- I think I'd like, if it's up to you, it's okay with you, I'd like to see you deal with the reason that the employer offers, that they say they reasonably believed for the termination. You haven't really touched on that yet. Okay. This is the workroom incident, the sit-down incident, whatever you want to call it. Yes. Where he comes in, he refuses to go to work. He sits down in the break room. He claims to have authorization. His supervisor comes in, Mr. McCracken, and says, go to work. He refuses. As I understand it, Mr. McCracken then calls the supervisor who supposedly authorized, and he said, no, I didn't. He still refuses to go to work. The client does. And then he says, I'm going to call that person. I'm trying to think of his name. Right. Mr. Cloud. And so, I think that's- And then, so we've got double refusal to do that, to go back to work. And I guess I'd like to have you respond to why there isn't evidence in the record that they legitimately, that was a legitimate non-discriminatory reason for firing him, and why they couldn't have reasonably believed that, regardless of what your client might think. So, I think that they could have reasonably believed that, but that doesn't entitle them to judgment as a matter of law, because a jury could find that that was a pretextual excuse. Yeah. And what would we base that on? So, first of all, we base it off this, to finish with McCracken, it's undisputed that he started this chain of events that resulted in my client- I want to talk about this particular event, and whether it was a sufficient basis when someone comes in, sits down, says, I'm not going to work, refuses twice to go to work, even after calling the individual who supposedly authorized them to sit down for an hour. Yes. Why isn't that sufficient on its own? To be a reason- The employer reasonably believes that that's what happened. So, Judge Moritz, I think that that could be a persuasive argument, and it should be made to the jury. You were the author of Fassbender, which I argued in that opinion, just like in the Ibrahim opinion that Judge Bacharach recently wrote. The plaintiff admitted to the conduct that the employer said that they were fired for. So, just proving they admitted to the conduct doesn't preclude a finding of pretext. In the McDonnell-Douglas case itself, it was not disputed that the plaintiff engaged in the activity the employer proffered as its reason. So, why could a jury find that this is an excuse, or a pretextual excuse? Well, part of it is because there's an unfair process. Plotkin talks about the timing and sequence of events. If it's suspicious and unfair, it can suggest a finding of pretext. So, it's undisputed. It is admitted in this case that McCracken's email about the break group incident started this chain of events that resulted in the termination. And along the way, we have- There is no break in the chain of causation. Each link in the chain becomes stronger. Leslie Fortney conducts an investigation, and she is supposed to be investigating my client's complaint of harassment and bullying, which is the only reason McCracken sent that email. Well, she has a preexisting motive and bias against Mr. Rutledge, because she's been upset about him mentioning, I'll get my lawyer involved if they don't bring him back to work on modified duty. That's not enough to create a question of fact here. She does an investigation. She interviews your client. She interviews Mr. McCracken. She interviews Mr. Cloud. Right. And she never puts her- Are you suggesting that any time a decision maker or someone who's part of the investigation might have some potential motive of any kind that you've got a fact question that takes it to the jury? I think that it is part of the totality of the circumstances in this case. I wouldn't say that that alone finds pretext. But with everything else, Leslie Fortney was supposed to conduct her investigation. It is undisputed her investigation was supposed to be different and separate than the investigation into my client. But instead, she is basically, a jury could see it as she is colluding with Jeanette Clam. There's supposed to be these two independent investigations, but they're sharing information with each other. Why? A jury could infer that it's because they want to make sure that the results match their preexisting motive and they don't come up with different conclusions. This whole comment about the cussing incident with the ladder, Leslie Fortney admits that that comment that my client reported was part of this discussion about a reasonable accommodation. She says she chose to omit that from her report and she couldn't provide a single explanation why. Those are undisputed facts in the record, which I would direct the court to. There's many facts that we've presented and the county says we're misconstruing the record. The county is saying we're taking things out of context. In the seventh volume of the appendix on page 136, in the county's reply and further support of their motion for summary judgment, there's a long list of undisputed facts. And those facts that are undisputed include things like, Kellison didn't know if he was the real decision maker. They include things like, Leslie Fortney couldn't provide any explanation for why this tough shit interaction was omitted and she doesn't even know if she has Jeremy McCracken about it. Why was that information withheld? A jury could find that suspicious. It is undisputed that my client is of a lower proficiency. Counsel, may I interrupt you? Yes. Everything that you're saying now, I'm trying to understand what it goes to for purposes of our analysis and review of the district court's ruling, which seems to rest on the application of the honest belief doctrine. Do you agree with that? Well, I think the application of the honest belief doctrine has to be limited to its proper place. We've cited three cases from this circuit, Rivera v. City and County of Denver, Kendrick v. Penske, and Young v. UPS, which was written by now Justice Gorsuch. And in each one of those opinions, the honest belief doctrine is not the end-all, be-all of pretext. It is only a proper rebuttal to an argument that the reason you have fired me is false. When it is applied, each of those three cases addresses other pretext arguments where the honest belief doctrine is totally irrelevant. So how are we to review then, given your position, the district court's contrary ruling? Are you saying the district court erred in invoking that here in analyzing the reason for termination? I think that the district court erred in invoking that doctrine in the manner that it did because it uses it as the guidepost for the entire pretext analysis and fails to appreciate how a jury could say, well, even if you believe that he didn't have permission to sit in the break room, that was really an excuse. Even in Young v. UPS, Judge Gorsuch wrote, after he concludes that there was no evidence undermining the sincerity of the belief, he emphasized we're not pointing to facts suggesting the relevant evidence was deliberately suppressed from the decision makers or ignored in order to further a discriminatory purpose. I think we've presented that evidence here. The facts that my client had permission from George Cloud, which is again an undisputed fact in the summary judgment record, was known to Kellison and the other decision makers. So the question is, why did they exercise their decision to believe one side over the other? Finally, I would say that this... Well, that's an interesting question. I'd like to talk about that. The district court made a finding that your client did have authorization from Mr. Cloud. He assumed it. But then he said, then the court said, well, nevertheless, Mr. Cloud told the investigators and the decision makers that he did not give authorization and basically, even if he was lying to them, they had every reason to believe he was telling the truth. And so you can't... I don't know. I'm struggling to know what to do with that. Well, what to do with it is send it to the jury because there are two conflicting plausible narratives that could be believed either way. And the jury might say, well, you believe George Cloud because you've been wanting to get rid of Mr. Rutledge for years because of his protected classes. So that's the type of dueling, plausible narratives that require the special attention of the jury and cannot be decided as a matter of law, a summary judgment. And at this time, I'd like to reserve my time for rebuttal. All right. Paula, turn the clock up. Do you have any questions? I don't. Nancy? I'm sorry. Did you have any questions? Okay. We'll hear from the ability. May it please the court. My name is Jeanne Devaney, and I am representing the Board of County Commissioners of Johnson County, Kansas, the appellee in this case. I want to focus on the events that occurred in November 2018 and talk initially about the fact that going into that timeframe, all of the decision makers, all of the people that were involved in the decision in this case, had extensive experience with Mr. Rutledge. They had all been involved in numerous issues that had been raised by him and about him, and they had seen that in nearly every case, no one supported Mr. Rutledge's version of events. From coworkers to supervisors to third parties to speedometers, Mr. Rutledge's version of events matched no one else's in nearly every instance. The county overlooked reports of bad behavior time and time again. And even after, they focus on this email that Tiffany Henschel sent in 2014, and it's important, I think, to recognize that, first of all, that was four years before this termination incident. But secondly, she wrote that email before the accommodation process that the county engaged in with Mr. Rutledge when he was undisputedly unable to perform the essential functions of his position. Despite the fact that the policy at that time said the county would work with people for only 60 days, they worked with him for seven months. And they did that even though there were open positions that matched his restrictions that he rejected. So the notion that there's some motive to fire him, when they had every reason to do that over that ensuing seven-month period, is simply just not the case. Well, viewing the evidence in the light most favorable to the plaintiff, why couldn't a reasonable jury determine that there was a motivation because of all of these claims? And they were self-insured that they did have a financial motive to get rid of him. Well, I mean, any employer in any instance could always have a motive to get rid of somebody, a financial incentive, who's filed a work comp claim. But that's not what the law says. The law says that the plaintiff has to come forward with, first of all, evidence to suggest that there was discrimination and retaliation, but also to prove that the employer's reasoning, the rationale for the decision, is unworthy of belief. Well, right. It's stage three of McDonnell-Douglas. But what his point is, I think, is that if you assume satisfaction, I mean, part of it is satisfaction of the prima facie case. But if you assume, as many of our questions are, assuming satisfaction in the prima facie case, still there is no preclusion of using evidence at the prima facie stage at stage three of McDonnell-Douglas. So all of this evidence of a motivation to fire by all of these people over these repeated claims that were costing the county a lot of money could be considered, couldn't it, at stage three of McDonnell-Douglas for pretext. I think it could be considered if there were any evidence of that. I guess I have two reactions to that. One, it could be considered if there were any evidence of that. There's no evidence that Jeremy McCracken, who was a first-line supervisor at a wastewater plant, had any idea or any care about how much the county was paying for his workers' compensation injuries. Really, the same is even true all the way up to Kenny Kellison. Unlike some cases where we see that supervisors have a financial motive for not having their employees file workers' comp claims, that's not present in this case at all. But beyond that, and I think the one area where the parties agree on this— Also an FMLA retaliation, isn't it? He knew he was taking FMLA, and there's evidence he wasn't happy about that. That's true. And if Jeremy McCracken were the supervisor, I think this would be—I'm sorry. If Jeremy McCracken were the decision-maker, I think this would be a very different case. But we're talking about a situation where what Jeremy McCracken did was report two things. He reported that there was a complaint about him and also reported Mr. Rutledge's undisputed behavior in refusing to go to work and claiming that Jeremy's supervisor gave him permission to do that. Which you have a district court finding saying Jeremy's supervisor did give the plaintiff here permission to do that. I agree that for purposes of summary judgment, you have to assume that. So we also have to assume that Mr. Cloud lied to the investigators when he said he did not give them permission. You have to assume that Jeremy— That's a lot of assumptions. You have to assume that he lied to Jeremy. You have to assume that he lied to Leslie. You have to assume that he put a lie in his notes. You have to assume that he lied to Jeanette Clam. You have to make all those assumptions that— Well, it's not really even an assumption, I guess, because we have a district court finding that says Mr. Cloud authorized this action. Or we're going to assume it, at least, for purposes of summary judgment. Right. In order to— And so you have that finding. And so I don't know that it's—honestly, it's not really an assumption. It's a fact that he lied. The question you have to say is, you know, and you indicated in your brief, well, nevertheless, they reasonably believed that he did not lie. That's right. You're right. You have to assume that he lied to all of those people. Yeah. But when you look at it from the perspective of Kenny Kellison and the HR folks that were advising him, they had absolutely no reason to believe that George Cloud was lying. And it's not just George Cloud. I mean, I think something that— Even though he was lying, which is what we have to deal with as a fact now. Right. They had no reason to believe that. All of their experience with Ron Rutledge was that he was saying everybody always was lying. All the time. And no one ever found that to be true. But also, when you look at the rest of the investigation, Mr. Rutledge said, everybody sits in the break room every day for an hour not working. That's why he wanted to do it, because everyone does it. That's disputed by George Cloud, who's there a couple days a week, Jerry McCracken, who's there every day, and Doug Nolkemper, who's there regularly and was there on that morning. When Ron Rutledge was interviewed by Leslie Fortney, he told her, I sat in the break room for an hour talking to at least one other person, maybe two. That fact is not disputed. And it's ironic that they criticized the district court for finding that. Well, that was his story. He said, I sat there for an hour talking to these people. Doug Nolkemper was in there. He said no one else was in there. He said Ron was sitting there with a purpose, intentionally not working, and even after his supervisor told him to go to work, he didn't go to work. So I think that if you assume that, as is proper to assume, that Jerry McCracken made these comments about his FMLA leave, again, if he had been making the decision, this would be a different case. But here, he wasn't. He just reported what happened. And the county took lots of steps. They interviewed multiple people twice. They looked at Jerry McCracken's computer. They looked at his notes. Jeanette even went out to the plant to see if it was possible that maybe he did see people sitting in the break room at 8 o'clock. And none of it. There was not one shred of evidence that supported Ron Rutledge's version of events. Except the district court saying, making a finding of facts, saying he did, he was told he was authorized to sit in the break room. But the cases are clear. Whether you agree with that or not, that's the finding. Well, but they say over, and the cases say over and over and over again, hundreds of cases in this circuit and others, that what the relevant inquiry is, I'm going to get it right, not whether the employer's proffered reasons were wise, fair, or correct. So George Cloud gave him permission. That's not the question. The question is whether the employer, in this case, Kenny Kellison, honestly believed that those reasons, honestly believed those reasons and acted in good faith. All of the information that Kenny Kellison had supported his decision. Well, he did have information that after, the day before they'd had a conversation, Mr. Cloud and Mr. McCracken and the plaintiff, the three of them have a conversation. Mr. McCracken leaves the conversation, and part of the conversation's about this whole idea of a sit down, I think, right? Right. Who's in the break room in the morning? And he leaves the conversation, and who's left there? And this is just the day before. It's just Mr. Cloud and the plaintiff. And that's when he says he gave him authority. He says it both before and after Jeremy McCracken left the room. My point is there is some facts in the record that might lend themselves to believing, for the employer believing, that Mr. Cloud may have done so. You're saying it's possible that Kenny Kellison could have believed Ronald Rutledge and disbelieved everyone else? Well, I'm saying we have a fact finding that Mr. Cloud lied. So here's the issue, though, that the cases are clear, and I think there are two cases in particular that go to this point. And it kind of goes back to that common phrase that we see in every summary judgment brief, which is that courts are not a super personnel board. Courts are not there to make a decision about whether Kenny Kellison made the right decision. The only question is, was his decision and the rationale for it unworthy of belief? So if you look at the estate of Bassett versus school district number one, you have a person who said, I saw this man masturbating in his car. And you have the man saying, no, I didn't. That is a dispute of fact. Of course, the court analyzes that and says, yeah, but that's not the question. The question isn't what actually happened in that car. The question is, is there any reason to genuinely dispute or to believe that the reason for firing that guy, because they believed her and they didn't believe him, is unworthy of belief? Is it so outrageous that it's unworthy of belief? And the court said, no. The employer was there. The employer talked to them both. The employer believed her. That is not evidence of pretext. Similarly, in Rivera versus city and county of Denver, that case was about a guy who was cleaning catch basins. And he reported that he cleaned 27. And then later he changed it to 17. And he actually submitted statements from his coworkers supporting his claim that he had cleaned 17 catch basins on that day. And the employer looked into it. The employer talked to people who had other observations. The employer actually did a test. And so here again, we have a dispute of facts. Did he clean 17 catch basins or did he not? He says he did. Other people say he didn't. That doesn't mean you don't get summary judgment. You only don't get summary judgment if the rationale, if the facts before the decision makers make their decision unworthy of belief. And what we have in this case is an employee who repeatedly gave false information for many, many years, including about Kenny Kellison. I mean, Kenny Kellison gets a call one day from Jerry McCracken and says, Ron told me to put a knob on here that doesn't lock because you said that we're not supposed to lock the door anymore. And Kenny's like, what? I said no such thing. Ron Rutledge goes to people and says, Kenny was here this afternoon and he was irate that you weren't here. And so they call Kenny and Kenny's like, I don't know what you're talking about. I wasn't there. He had a history with this guy. And so when he gets a report that he admittedly, Ron Rutledge admits that he walked into Jerry McCracken's office that morning and he said, I'm going to be in the break room not working for an hour. And then he admits that he goes to the break room and he sits there and he doesn't work 45 minutes or an hour. He admits that. Jerry McCracken comes out and says, what are you doing? You need to get to work. No, George said I didn't have to. Admits that. On its face, you don't have to listen to anybody else. On its face, that story is not believable. But then you get to the investigation, which, again, disputes everything Ron Rutledge says. George Cloud disputes it. Jerry McCracken disputes it. Doug Nolkemper disputes it. Jeanette goes out trying to figure out what possibly is going on here. There is nothing that supports his version of events. And so the question is not, did he or did he not sit in the break room? Just like the question was not, did he or did he not masturbate? And the question was not, did he or did he not clean 17 catch basins? The question is, from Kenny Kellison's point of view, was it reasonable, and actually it's even stronger than that, did they present evidence that the reason that Kenny Kellison fired Ron Rutledge is unworthy of belief? Is it so contradictory? Again, let me look at the exact language. Were the reasons so incoherent, weak, inconsistent, or contradictory that a rational fact finder could conclude the reasons were unworthy of belief? When you look at the facts in this case, and again, I agree, look at them all. Everything that happened with Ron Rutledge, look at them all. There is no way that a reasonable jury could possibly conclude that Kenny Kellison's conclusion that Mr. Rutledge sat in the break room, refused to work, and lied about why he did that were unworthy of belief. If you don't have more questions, I'll sit down. Thank you. Thank you. Your Honors, if the Honest Belief Doctrine is used the way the county wants it to and the way the district court employed it, the whole entire summary judgment notion of pretext will be gobbled up and consumed. Whether or not Mr. Rutledge had permission to sit in the break room isn't the ultimate inquiry. The ultimate inquiry is whether that was an excuse used by the county to get rid of an employee based on protected classes. Why would it be believable to believe Ron Rutledge? Because he gets a one percent raise for the first time in his entire career, and part of that is that you need to have more teamwork and talk with your friends more. Talk with your co-workers. And he says, Cloud says, sit in the break room and mingle with them. Jeremy McCracken says he was in there until 7.15. George Cloud says he took the call at 7.30. As soon as my client talked to George Cloud and he said, go back to work, he went back to work. They had a sit-down discussion that afternoon and discussed a transfer. Why is George Cloud the only person that says there's another reason, there's another solution besides firing him? I think it's because he knows that he said something to my client, and my client understood it as permission to sit in the break room and mingle with his co-workers, try to get along with them. Jeremy McCracken says his daily routine was to come in after 7 and say, let's get to work. We should be working. It's after 7. But not to my client. My client was working at 7 a.m., just like he did for the week after this incident happened. There was a lesser form of discipline. A jury could see that the county was so blinded by its pre-existing motive to fire my client that they seized on this opportunity. And we'll ask for a reversal. Thank you, Your Honor. Thank you. This matter is submitted. I think both sides did an excellent job in your briefs and in your arguments today, and I appreciate the effective advocacy of both sides.